**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **RUTGER L. VAN ZANTEN,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | **Civil Action No. 3:02-CV-2649-P** |
| **v.** | § | |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and an

Order of the Court in implementation thereof, subject cause has been referred to the United States

Magistrate Judge.  Before this Court are the following:

(1)    Plaintiff's *Motion for Summary Judgment* and *Brief in Support of Plaintiff's Motion for Summary Judgment*, filed June 18, 2003;

(2)    Defendant's *Motion for Summary Judgment,* filed August 18, 2003;

(3)    *Defendant's Response to Brief in Support of Plaintiff's Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment*, filed August 18, 2003; and

(4)    Plaintiff's *Brief in Reply to Defendant's Response to Brief in Support of Plaintiff's Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment*, filed September 3, 2003.

Having reviewed the evidence of the parties in connection with the pleadings, the undersigned

recommends that Plaintiff's motion for summary judgment be **DENIED**, and that Defendant's

motion for summary judgment be **GRANTED**.

1

# I.   BACKGROUND[1]

## A.   *Procedural History*

Rutger Van Zanten ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner"), who denied his claim for disability benefits under Title II of the Social Security Act.  On February 1, 1999, Plaintiff filed an application for disability benefits under Titles II and Title XVIII, Part A of the Social Security Act. (Tr. at 85-87.)  Plaintiff claimed he was disabled due to a back injury and depression.  (Tr. at 69).  Plaintiff's application was denied initially and upon reconsideration. (Tr. at 64-68, 71-74.)  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 75.)  A hearing, at which Plaintiff personally appeared and testified, was held on April 10, 2000.  (Tr. at 37-61.)  The ALJ issued his decision on April 27, 2000.  (Tr. at 20-25.)  The ALJ concluded that Plaintiff was not disabled, as defined in the Social Security Act, because there were a significant number of jobs in the national economy that he could perform.  (Tr. at 25.)  The Appeals Council denied Plaintiff's request for review on September 27, 2002.  (Tr. at 8-9.)  Plaintiff then brought this timely appeal to the United States District Court pursuant to 42 U.S.C. § 405(g).

## B.   *Factual History*

### 1.   Age, Education, and Work Experience

Plaintiff was born on April 29, 1948 in the Netherlands, where he completed lower school and two years of basic training.  (Tr. at 43, 108.)  He moved to the United States at the age of 26.  (Tr. at 44.)  His past relevant work experience includes employment as a truck driver.  (Tr. at 45.)

### 2.   Medical Evidence

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

Plaintiff sought treatment at Kaiser Permanente on October 10, 1997 for stomach cramps, diarrhea, and lightheadedness.[2] (Tr. at 147.)  He also discussed his problems with sleeping, crying, and becoming upset easily.  *Id*.  He indicated that his wife had filed for a divorce in May of 1996, which became final in November of 1996.  *Id*.  He was diagnosed with depression and received a prescription for Prozac.  *Id*.  On October 17, 1997, at a follow-up appointment for treatment of his blood pressure and depression, Plaintiff's dosage of Prozac was increased from 20 to 30 milligrams. (Tr. at 146.)  At an appointment on November 3, 1997, the notes indicate that Plaintiff was "little better overall" and his Prozac dosage was increased to 40 milligrams; Plaintiff also received treatment for high cholesterol. (Tr. at 145.)  On December 19, 1997, Plaintiff received treatment for his depression, high cholesterol, and a cough.  (Tr. at 143.)  Plaintiff received a refill of his prescription for Prozac, as well as treatment for stiffness in his back, depression, and high cholesterol, on January 19, 1998.  (Tr. at 142.)  At an appointment on February 11, 1998, Plaintiff reported that he was sleeping better with the Prozac.  (Tr. at 141.)  On March 18, 1998, Plaintiff received treatment for depression, as well as a sore throat, cough, and diarrhea.  (Tr. at 140.)  On April 30, 1998, the police took Plaintiff to Parkland Hospital ("Parkland"); he was then admitted to the psychiatric ward of Columbia Green Oaks Hospital ("Green Oaks").  (Tr. at 149.)  Psychiatrist Steve Roche, M.D. ("Dr. Roche"), performed a psychiatric evaluation of Plaintiff on May 6, 1998. (Tr. at 156-160.)  In the evaluation, Dr. Roche noted that Plaintiff was brought to Parkland because he had set fire to his van, written a suicide note, and waved his gun around, saying that he would kill himself.  (Tr. at 156.)  Plaintiff told Dr. Roche that he had purchased the gun shortly before entering the hospital, with the intent to use the gun to commit suicide.  (Tr. at 157.)  Plaintiff said that he had

---

[2]It appears that Lorick Fox, PA-C, provided all the treatment Plaintiff received at Kaiser Permanente.

previously taken pills for depression, but that he had not been taking the medication for the five weeks prior to his admission.  (Tr. at 156.)  Dr. Roche assigned Plaintiff a GAF of 10.[3]  (Tr. at 149.)

Plaintiff was discharged from Green Oaks on May 14, 1998.  (Tr. at 149.)  At the time of discharge, he was diagnosed with major depressive disorder and dependent personality traits, and as experiencing severe psychosocial stressors.  (Tr. at 153.)  He was assigned a GAF of 55.  *Id.*  His discharge medications include Dalmane and Paxil.  (Tr. at 152.)

On August 9, 1998, while traveling through California, Plaintiff was sleeping in the cabin of a tractor trailer when the driver of the truck struck another tractor trailer.  (Tr. at 162.)  Plaintiff was thrown from the sleeping cabin.  (Tr. at 162.)  Plaintiff received treatment immediately after the accident at Barstow Community Hospital, where he reported pain in the right foot and left lower leg.  (Tr. at 162.)  The X-rays of his hands, arms, chest, right foot, and cervix showed no fractures, but the diagnostic radiology report noted foraminal stenosis on the left C2-3 and C3-4 and on the right at C2-3, as well as accentuated lordosis.  (Tr. at 167-69.)  The physician who examined him prescribed ibuprofen and refilled Plaintiff's prescriptions for Wellbutrin and Paxil.  (Tr. at 163.)

On August 17, 1998, Plaintiff saw Dr. Charles Willis ("Dr. Willis") with complaints of constant pain in his neck, low back, left shoulder, right foot, and left leg.  (Tr. at 172.)  Dr. Willis assigned tentative diagnoses of acute cervical and lumbosacral strain, in addition to left shoulder and right ankle strain.  (Tr. at 173.)

---

[3]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000), the Global Assessment of Functioning Scale is used to report the clinician's judgment of the individual's overall level of functioning.  GAF scores of 41 to 50 reflect serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  GAF scores of 51-60 indicate moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 663 n.2 (8th Cir. 2003) (citations omitted).

On September 3, 1998, Plaintiff underwent magnetic resonance imaging ("MRI") of his lumbar spine. (Tr. at 339-40.) The impressions of Dr. Marcie Coben ("Dr. Coben") included loss of disc signal/hydration at L5-S1, probable posterior annular tear at L5-S1, and disc protrusion at L5-S1 and L4-L5.

On October 27, 1998, Plaintiff was taken by ambulance to Parkland Hospital, and then transferred to Green Oaks. (Tr. at 213, 229.) His girlfriend had called 911 because Plaintiff was threatening to commit suicide. (Tr. at 218.) On admission to Green Oaks, Plaintiff was diagnosed with major depressive disorder and assigned a GAF of 60 by psychiatrist John Pascoe, M.D. ("Dr. Pascoe"). (Tr. at 236.) At Green Oaks, Plaintiff reported that the medications were working well, that his Paxil dosage had been increased from 20 to 30 milligrams, and that he was taking 150 milligrams of Wellbutrin per day. (Tr. at 238.) Dr. Pascoe assigned Plaintiff a GAF of 65 upon his discharge on October 30, 1998. (Tr. at 236.)

Dr. Phillip Williams ("Dr. Williams") conducted a neurological consultation with Plaintiff on December 2, 1998, at the request of his chiropractor, Dr. Marcia Miller ("Dr. Miller"). (Tr. at 254.) Dr. Williams stated that "[i]n view of the fact that he has not responded to good, conservative treatment at this point, and with the abnormal findings on the exam as well as the MRI, I think we should do a lumber myelogram and post-myelogram CAT scan." *Id.* Dr. Williams then stated, "[o]nce we have this information, then we will make a determination as to whether surgery is indicated or not." *Id.*

On December 16, 1998, Dr. Coben performed a cervical MRI revealing mild reversal of the usual cervical lordosis and mild spinal stenosis at the C4-C5 level. (Tr. at 325.) The MRI also revealed mild foraminal narrowing at C4-C-5 level and disc protrusion at C3-C4 that did not indent

the cervical cord.  (Tr. at 326.)

Dr. Miguel Banta ("Dr. Banta") performed a lumber myelogram needle insertion on December 28, 1998.  (Tr. at 320-21.)  Those test results revealed a disc bulge at L3-L4 causing mild acquired spinal stenosis, a herniated nucleus pulposus impacting the thecal sac at L4-L5, and disc herniation at L5-S1 touching but not compressing the thecal sac.  (Tr. at 320.)  Dr. Banta stated that an epidural steroidal injection ("ESI") or electroceutical nerve block may help Plaintiff, and that a "[s]urgical consult is also to be considered."  (Tr. at 323-24.)

On February 26, 1999, Plaintiff saw Dr. Mallou[4] at the Metro Imaging and Surgical Clinic. (Tr. at 401.)  Plaintiff reported experiencing constant lower back pain, rated at a 6 out of 10, that radiated to his knees and produced insomnia.  *Id.*  The examination revealed a limited range of motion at the shoulders and in the lumbar and thoracic spine, due to pain, with no limited range of motion reported in the cervical spine.  *Id.*  Dr. Mallou's assessment was lumbar radiculitis; the treatment plan included 20 milligrams of Paxil, Ambien, and the scheduling of an ESI.  *Id.*  Plaintiff received an ESI on March 26, 1999.  (Tr. at 400.)

On March 26, 1999, Dr. Valerie Meshack ("Dr. Meschak") performed a consultative psychiatric examination of Plaintiff.   (Tr. at 255-58.)   In the evaluation, Plaintiff denied hallucinations and paranoid or delusional thinking.  (Tr. at 257.)  He also denied having any current suicidal ideation.  *Id.*  His attention and concentration appeared to be intact, and he was "fairly logical and coherent."  *Id.*  Plaintiff reported rising at the same time every morning, cooking and cleaning for himself, caring for his children every other weekend, and going to church occasionally. (Tr. at 256.)  He also reported that he had a good relationship with his family in the Netherlands and

---

[4]The record does not contain the first name of Dr. Mallou.

that he had two friends on whom he could depend.  (Tr. at 256-57.)  Dr. Meshack's diagnoses included moderate major depressive disorder and a current GAF of 30.  (Tr. at 258.)

Plaintiff received an ESI on March 26, 1999.  (Tr. at 400.)  On March 31, 1999, Plaintiff saw Dr. Mallou again; an examination of the thoracic spine revealed a full range of motion without pain, and a limited range of motion in the lumbar region.  (Tr. at 399.)  Dr. Mallou prescribed 7.5 milligrams of Lortab, and another ESI for the following week.  *Id.*  Plaintiff received a second ESI on April 8, 1999.  (Tr. at 398.)  On April 15, 1999, Plaintiff saw Dr. Mallou.  (Tr. at 396.)  An examination of the thoracic and lumbar spine again showed limited range of motion with pain in the lumbar region, and Dr. Mallou administered another ESI.  (Tr. at 396-97.)

Dr. Frank Zimmerman ("Dr. Zimmerman") completed a mental capacity assessment of Plaintiff on April 19, 1999.  (Tr. at 285-90.)  Dr. Zimmerman determined that Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions, as well as in the ability to complete a normal workweek without interruptions from psychologically based symptoms.  (Tr. at 285-86.)  In all other areas, Dr. Zimmerman indicated that Plaintiff was not significantly limited.  *Id.*  Dr. Zimmerman also completed a psychiatric technique form, determining the degree of Plaintiff's functional limitations with respect to Listing 12.04.  (Tr. at 298.)  Dr. Zimmerman determined that Plaintiff was not restricted in daily living and had no difficulties in maintaining social functioning.  *Id.*  He seldom had deficiencies of concentration, persistence, or pace.  *Id.*  Dr. Zimmerman noted that Plaintiff had "[o]nce or [t]wice" experienced episodes of decompensation.  *Id.*

Dr. R.S. Rosenberger completed a Residual Physical Functional Capacity Assessment on April 20, 1999.  (Tr. at 308-15.)  He indicated that Plaintiff could occasionally lift 50 pounds,

frequently lift 25 pounds, and sit for about 6 hours in an 8-hour workday.  In addition, he indicated that Plaintiff could frequently crawl and balance, occasionally crouch, stoop, and climb ramps and stairs, and never climb a ladder, rope, or scaffold.  (Tr. at 310.)

On April 23, 1999, Plaintiff spent the night in Medical City Dallas Hospital after complaining of chest and abdominal pains.  (Tr. at 26-70.)  His gastrointestinal symptoms were resolved, and he was diagnosed with mild bronchitis.  (Tr. at 270.)

Dr. Roche wrote a letter on May 4, 1999, stating that Plaintiff "really is not able to function in any capacity at this time (due to his depression)...I consider [Plaintiff] disabled until we can get him stabilized."  (Tr. at 354.)  On August 5, 1999, Dr. Roche wrote a letter stating that he had recently seen Plaintiff for treatment of his depression.  (Tr. at 353.)  Dr. Roche wrote that:

> although [Plaintiff's] depressive symptoms have improved, he has recently had some anxiety problems (originally thought to be cardiac pain–but was later ruled out) and we have had to adjust his medications again.  Patient recently again was not able to function because of his depression and anxiety and was briefly on disability for psychiatric reasons starting May 5, 1999. [Plaintiff's] depression is once again stable at this time.

*Id.*

On July 7, 1999, Plaintiff saw Dr. Phillip Williams ("Dr. Williams"), a specialist in neurological surgery.  (Tr. at 402.)  Dr. Williams examined Plaintiff and diagnosed him with lumbar spondylosis and degenerative disc disease, and recommended an updated lumbar myelogram and post-myelogram CAT scan.  *Id.*

Dr. E.R. Leggett completed a Residual Physical Functional Capacity Assessment on July 9, 1999, indicating that Plaintiff's ability to climb, stoop, and kneel was occasionally limited, and that his ability to balance, kneel, and crouch was frequently limited.  (Tr. at 300-07.)  Dr. Leggett noted no other functional limitations.  *Id.*

On August 31, 1999, Plaintiff returned to Dr. Williams for a follow-up appointment.  (Tr. at 403.)  Dr. Williams repeated his diagnoses of lumbar spondylosis and degenerative disc disease and added a diagnosis of radiculopathy.  Dr. Williams again recommended a lumbar myelogram and post-myelogram CAT scan, noting that the insurance company had not approved those tests previously.  *Id.*

Chiropractor John Tignor ("Tignor") conducted a medical evaluation of Plaintiff on September 28, 1999 for the Texas Workers Compensation Commission.  (Tr. at 366-77.)  In the Waddell Non-Organic Signs Evaluation Report section, Tignor indicated that Plaintiff displayed disproportionate verbalization, facial expression, and pain behavior.  (Tr. at 370.)  An orthopedic exam revealed straight leg raises within normal limits.  (Tr. at 371.)  Tignor determined that Plaintiff had a 14% impairment to his body as a whole.  (Tr. at 372.)

On January 10, 2000, Dr. Kenneth Buley ("Dr. Buley") prepared a report for the Texas Rehabilitation Commission Disability Determination Services based on his review of Plaintiff's medical records and a physical exam.  (Tr. at 355-57.)  Dr. Buley's physical examination revealed no muscle atrophy, normal muscle tone, and essentially negative straight leg raises; he also observed that Plaintiff "ambulates with a normal gait pattern[.]"  (Tr. at 356.)  After reviewing Plaintiff's history, physical exam, and test results, Dr. Buley opined, that Plaintiff had "pretty good standing and walking tolerance[]" but could not stand and walk for prolonged periods of time.  *Id.*  Dr. Buley also observed that Plaintiff could sit without much difficulty and lift up to 45 pounds.  Finally, Dr. Buley recommended that Plaintiff continue his home exercise program, and not do repetitive bending and lifting.  *Id.*

On January 10, 2000, Dr. Timothy Oltersdorf wrote a radiological report stating that he

found an "essentially normal lumbosacral spine." (Tr. at 358.) He found a mild degree of degenerative disc disease at L5-S1, but found that "[t]here is no radiographic evidence of spondylolysis or spondylolisthesis." *Id*.

Plaintiff saw Dr. Williams for a follow up appointment on January 26, 2000. (Tr. at 365.) Dr. Williams stated that "[t]here is very mild cervical stenosis, but no herniation or compression of the nerve roots. It is difficult from a structural point to determine the cause of his back pain. I would not think there is anything neurosurgical." *Id*. Dr. Williams also offered to arrange for an orthopedic spine consultation. *Id*.

Dr. Craig C. Callewart ("Dr. Callewart") of the Orthopedic Associates of Dallas examined Plaintiff on February 25, 2000. (Tr. at 363-64.) Dr. Callewart's report summarizes Plaintiff's symptoms and treatment history. (Tr. at 363.) The report also includes Dr. Callewart's findings based on a physical examination of Plaintiff and a review of his lumbar myelogram and MRI results. (Tr. at 363-64.) Dr. Callewart's impression was "[i]nternal disc derangement 5/1." (Tr. at 364.) Dr. Callewart also stated that Plaintiff would undergo a discogram in consideration of fusion. (Tr. at 364.)

In a note dated March 10, 2005, a doctor wrote that Plaintiff, a patient of the Orthopedic Associates of Dallas, LLP, was totally disabled from his back injury, and that they were "currently working him up for possible lumbar fusion." (Tr. at 362.)

3.    Hearing Testimony

At the hearing on April 10, 2000, the ALJ heard testimony from Plaintiff and a vocational expert ("VE"). (Tr. at 37-61.) Plaintiff was represented by counsel at the hearing. (Tr. at 39.) Plaintiff testified that he was 51 years old. (Tr. at 43.) He also testified that he had completed the

10

lower school in the Netherlands, came to the United States at the age of 26, and received no education in the United States.  (Tr. at 43-44.)  Plaintiff stated that he learned English "through TV or reading newspapers, and my ears."  (Tr. at 44.)  Plaintiff said he could read about 90% of English. (Tr. at 56.)  Plaintiff stated that he drove tractor trailers for most of the time he had lived in the United States, until the accident on August 8, 1998.  (Tr. at 45.)  Plaintiff testified that he had been unable to work mainly due to his back injury.  *Id.*  Plaintiff described the pain as in his lower back, going into his legs, and stated that "[i]t feels like when you're working in the field, and bending over all the time" and that he felt this pain "[e]veryday constantly."  (Tr. at 46.)  He testified that for the pain he took Lortab and another type of pill, the name of which he did not know, but that he did not take the pills all the time.  (Tr. at 47.)  He also stated that he received injections for the pain.  (Tr. at 55.)  Plaintiff stated that he spent most of his time lying down on his back, but was able to cook, clean, go to the store, and supervise his four children when they visited him on weekends.  (Tr. at 48.)  When asked by the ALJ why he could not work, Plaintiff testified that he could not do so because "it hurt me for sitting long, it hurt me for standing long."  (Tr. at 49.)  In response to a question from his attorney, Plaintiff stated that he could not do a job that would not allow him to lie down during the day.  (Tr. at 50.)  He testified that he considered Dr. Callewart to be his main treating doctor, but was waiting to see him again until his worker's compensation agreed to pay for the program.  (Tr. at 51.)  With respect to his depression, Plaintiff stated that he had been receiving treatment until August 1999, when the insurance expired, and that since then he had not been able to take the medication prescribed for his depression, including Paxil, Trazodone, Buspar, and Dicyelimine.  (Tr. at 53-54)  Plaintiff stated that he felt depressed two to three times per week.  (Tr. at 54.)

The ALJ posed a hypothetical question to the VE, assuming an individual who could perform light work, required a sit/stand option, could not climb, balance, crawl or kneel, could not engage in repeated pushing, pulling, and extended reaching, and could only occasionally stoop, crouch, and squat. (Tr. at 58.) The ALJ also limited the individual to generally simple tasks to account for a less than moderate concentration deficit. *Id.* The VE testified that such a person could perform the job of bench assembler, sorter inspector, and small parts packager. *Id.* In response to questions posed by Plaintiff's attorney, the VE stated that an individual who had to leave the work station to lie down periodically throughout the day could not remain competitively employed. *Id.* The ALJ would not permit the VE to testify as to the effect of any of the drugs Plaintiff had been prescribed on his ability to work. (Tr. at 59.) The VE testified that she was unsure of how Plaintiff's depression would affect his employability. *Id.*

## C.   *ALJ's Findings*

The ALJ issued his findings on April 27, 2000. He found that Plaintiff had not engaged in substantial gainful activity since April 30, 1998, and that he suffered from low back pain secondary to degenerative disc disease and depression. (Tr. at 21.) The ALJ concluded that Plaintiff's impairments would have more than a slight effect on his ability to work, and therefore were severe. *Id.* The ALJ found that Plaintiff had no impairment of the same as or equal to impairments set forth in the listing of impairments at Appendix 1 of 20 C.F.R. Part 404, Subpart P. *Id.*

The ALJ noted that Plaintiff had been hospitalized for severe depression for a two-week period beginning April 30, 1998, and was discharged in an improved condition. *Id.* The ALJ stated that Plaintiff was diagnosed with neck, back, left shoulder and right ankle strain after the accident of August 9, 1998. *Id.* The ALJ then discussed Plaintiff's second hospitalization for depression,

noting that the suicide threat occurred after Plaintiff became concerned over a worker's compensation payment and appeared to improve after that issue was resolved. (Tr. at 22.) The ALJ found that Plaintiff experienced episodic depression, triggered by events such as "not receiving his worker's compensation settlement as quickly as he thought he should." *Id.* Plaintiff's depression, according to the ALJ, appeared to be controlled with medication, and did not appear to be severe and chronic. *Id.* The ALJ nevertheless concluded that Plaintiff's RFC should be limited to those jobs requiring only simple tasks. *Id.*

With respect to Plaintiff's lower back pain secondary to degenerative disc disease, the ALJ discussed Dr. Buley's findings based on his consultative examination of Plaintiff. (Tr. at 22.) The ALJ also referenced an unsigned note in the medical record indicating that Plaintiff was being considered for lumbar fusion. *Id.* According to the ALJ, however, no evidence in the record warranted such a procedure. *Id.* The ALJ also found that a lumbar myelogram revealed disc herniation at the L3-L4 and L5-S1 levels, but no neurological involvement. (Tr. at 23.)

The ALJ found that Plaintiff had the residual functional capacity to perform less than the full range of light work. (Tr. at 23.) The ALJ noted that Plaintiff was limited by an inability to climb, balance, kneel, or crawl, and could squat, stoop, or crouch only occasionally. *Id.* In addition, the ALJ found that Plaintiff required a job where he had the option to sit or stand, and could not engage in repetitive pushing, pulling, or extended stretching. *Id.* The ALJ determined that Plaintiff was unable to return to his past work. *Id.* Because Plaintiff could not perform the full range of light work, the ALJ relied on the testimony of a VE to determine whether he could perform other work in the national economy. *Id.* The ALJ found that Plaintiff could perform the job of bench assembler, with 80,000 jobs in the national economy, as a sorter/inspector, with up to 80,000 jobs

in the national economy, or as a small parts packager with up to 60,000 jobs in the national economy. (Tr. at 24.) The ALJ therefore determined that Plaintiff was not disabled as defined by the Social Security Act. *Id.*

## II.   ANALYSIS

*A.*   *Legal Standards*

1.   <u>Standard of Review</u>

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

2.   <u>Disability Determination</u>

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes the following sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564.  The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other

similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant

is not disabled at any point in the five-step review is conclusive and terminates the analysis.

*Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.      *Issues for Review***

      Plaintiff presents the following twenty-one issues[5] for review:

(1)      The ALJ erred in rejecting the opinions of Plaintiff's treating physicians and health care providers and in failing to acknowledge all restrictions imposed by the treating physicians and health care providers;

(1a)     The case should be remanded for consideration of evidence of post-decision surgery;

(2)      The ALJ drew inappropriate conclusions from the evidence;

(3)      The ALJ failed to follow the correct legal standard for determining the severity of an impairment;

(4)      The ALJ erred in failing to explain how he arrived at the residual functional capacity;

(5)      The ALJ erred in failing to include all relevant impairments in his hypothetical question to the Vocational Expert;

(6)      The ALJ erred in failing to properly address the issue of Plaintiff's literacy in the English language;

(7)      The ALJ erred in failing to call an interpreter in this case;

(8)      The ALJ erred in failing to address the issue of Plaintiff's education;

---

[5]After filing the brief in the instant matter, Plaintiff's counsel was twice admonished by courts in the Northern District that a client's interests are best served by focusing on one or several strong arguments on appeal, rather than raising every possible ground of error. *Morgan v. Barnhart*, 3:02-CV-2397-N (N.D. Tex.) (findings and recommendation issued December19, 2003, order adopting findings and recommendation issued January 6, 2004) (21 grounds of error raised); *Williams v. Barnhart*, 3:03-CV-109-P (N.D. Tex.) (findings and recommendation issued December 31, 2003, order adopting findings and recommendation issued January 9, 2004) (16 grounds of error raised).  In his findings and recommendation in *Morgan*, the Court noted that "[t]he majority of plaintiff's arguments are either inadequately briefed, based on procedural technicalities, or plainly wrong."  Prior to receiving those admonishments, Plaintiff's counsel raised 27 separate grounds of error in a brief filed in *Capers v. Barnhart*, 3:03-CV-69-D (N.D. Tex. July 28, 2003).  In *Capers*, Judge Fitzwater noted that several alleged grounds of error in Plaintiff's counsel's brief included only one or two conclusory sentences of support.  These deficiencies are present in the instant brief.  Counsel is cautioned to heed the admonishments he has received and remedy such deficiencies in future filings.

(9)    The ALJ erred in failing to make a specific finding regarding Plaintiff's credibility and in failing to discuss this issue in the body of his decision;

(10)   The ALJ erred in failing to offer Plaintiff's former counsel an opportunity to object to the evidence in the file;

(11)   The ALJ erred in failing to adequately consider the applicability of the listings in this case;

(12)   The ALJ failed to adequately consider issues relating to Plaintiff's medication;

(13)   The ALJ failed to adequately consider issues relating to measures used by Plaintiff to relieve his pain;

(14)   The ALJ erred in not adequately considering all of Plaintiff's impairments;

(15)   The ALJ failed to properly consider Plaintiff's allegations of pain or the ALJ failed to follow the requirements of certain Social Security Rulings;

(16)   The ALJ failed to address the impact of all of Plaintiff's various impairments in combination;

(17)   The ALJ's failed to satisfy the requirements of SSR 96-7p in relation to the requirements of 20 C.F.R. § 404.1529;

(18)   The ALJ failed to fully and fairly develop the facts as required by Fifth Circuit jurisprudence;

(19)   The ALJ failed to properly develop the medical record in this case and the ALJ erred in not ordering additional consultative examinations, given his duty to develop the medical record;

(20)   The ALJ erred in not seeking the assistance of a medical expert.

**C.    Issue One: Opinions of, and Restrictions Imposed by, Treating Physicians and Health Care Providers**

Plaintiff first contends that "[t]he ALJ erred in rejecting the opinions of plaintiff's treating physicians and health care providers and in failing to acknowledge all restrictions imposed by the treating physicians and health care providers."  (Br. at 1,5.)  Plaintiff further argues that "[s]ince the

17

ALJ failed to note all of the restrictions placed on plaintiff by his treating and consulting physicians, this amounted to a *de facto* rejection of these opinions, therefore requiring at least a remand." (Pl. Br. at 8.) In his briefing on this issue, Plaintiff raises several other grounds of error as well, each of which is addressed below.

### 1.    ALJ's Finding With Respect to Surgery

Plaintiff alleges three points of error regarding the following statements made by the ALJ in his findings:

> In a note dated March 10, 2000, a doctor (whose signature is illegible) stated that the claimant was "totally disabled from his back injury and currently working him up for possible lumbar fusion." However, although the claimant said at the hearing that he may have to undergo a fusion someday, there really is no evidence of a vertebrogenic disorder that would warrant such a procedure.

(Pl. Br. at 5; Tr. at 22.) Plaintiff argues that by making such statements, the ALJ "plac[ed] himself in the position of a physician by expressing a medical opinion, and in fact implicitly plac[ed] his own opinion above that of a licensed doctor." (Pl. Br. at 5.) Plaintiff also contends that the ALJ erred in concluding that surgery was not indicated because "physicians other than the doctor noted above have considered surgery[.]" *Id*. at 5-6. In addition, Plaintiff contends that the ALJ improperly failed to fully develop the record by not obtaining clarification of the opinion expressed by the doctor who authored the note with the illegible signature. *Id*. at 6.

The note in question, dated March 10, 2000 and written on an Orthopedic Associates of Dallas prescription form, states as follows:

> To whom it may concern: Mr. Van Zanten is a pt. of ours who is currently totally disabled from his back injury & currently working him up for possible lumbar fusion-

(Tr. at 362.) The note is accompanied by Dr. Callewart's report dated February 25, 2000, noting that

18

Plaintiff will undergo a discogram in consideration of fusion.  (Tr. at 363-64.)

First, Plaintiff argues that the ALJ improperly substituted his own opinion for that of a medical doctor regarding Plaintiff's need for surgery.  (Pl. Br. at 5.)  Plaintiff cites *Spencer v. Schweiker* in support of this argument.  678 F.2d 42 (5th Cir. 1982).  In *Spencer*, the medical evidence was limited to records from the treating physician and two consultative examinations.  *Id.* at 43.  The plaintiff had seen his treating physician three times over a period of nearly a year; on the last visit, the physician "indicated that [the plaintiff] was 'disabled from manual labor with and without fusion.'"  *Id.*  One consulting physician severely restricted the plaintiff's activities; the other determined that the plaintiff "was disabled for gainful employment."  *Id.*  The Fifth Circuit found that "[t]he overall medical testimony, contrary to the ALJ's brief observation that the claimant appeared to be able to walk without difficulty and could rotate his neck, would indicate that [the plaintiff] is disabled within the meaning of the Act."  *Id.* at 45.  The ALJ's finding that the plaintiff was not disabled, in the face of overwhelming evidence that he was disabled, "raises serious questions...with respect to rendition by the ALJ of an expert medical opinion which is beyond his competence."  *Id.*

Here, in contrast, the ALJ has not made a finding that is contradicted by evidence in the record.  The Orthopedics Associates' note states only that fusion is being considered, not that fusion is warranted.  The ALJ's findings acknowledges that note and its statement that fusion is being considered.  The ALJ then observes that the medical evidence does not indicate a need for lumbar fusion.  Plaintiff points to no evidence in the record that contradicts the ALJ's finding on this point.  Plaintiff asserts that physicians other than the author of the Orthopedic Associates' note considered surgery, but cites only the parts of the record containing that note and a letter from Dr. Williams.

Dr. Williams' letter states that once he had results of the lumbar myelogram and post-myelogram CAT scan, he would "make a determination as to whether surgery is indicated or not." (Tr. at 254.) Dr. Williams later stated that "at this time I would not think anything surgical would need to be offered." (Tr. at 365.)  Thus, in contrast to the ALJ in *Schweiker*, the ALJ in this case does not appear to be rendering his own opinion that surgery was not indicated, but simply reciting the opinion of one of Plaintiff's treating physicians.  Accordingly, the Court finds that the ALJ, based on the evidence before him, did not improperly substitute his opinion for that of a medical doctor in stating that surgery was not warranted.

Plaintiff also contends, essentially, that substantial evidence does not support the ALJ's finding that surgery is not indicated because physicians other than the author of the Orthopedic Associates' note considered surgery.  (Pl. Br. at 5-6.)  Plaintiff points to only one other physician who considered surgery, Dr. Williams, and he subsequently determined that surgery would not be appropriate.  (Tr. at 365.)  The Court also found during its review of the record that one other physician stated that a "[s]urgical consult is to be considered[]" after reviewing the results of a lumbar myelogram.  (Tr. at 324.)  However, none of Plaintiff's physicians or health care providers had determined that fusion was appropriate at the time the ALJ issued his decision.  Thus, substantial evidence supports the ALJ's finding that surgery was not warranted.

Plaintiff also argues that "as part of his obligation to fully develop the case, the ALJ should have contacted the doctor. . .if he had questions about the basis of his opinions, or, failing this, should have asked plaintiff's former attorney to do this." (Pl. Br. at 6.)  The ALJ is bound to make every reasonable effort to obtain from a claimant's treating physicians all the medical evidence necessary to make a determination.  20 C.F.R. § 416.912(d).  Although the ALJ has a duty to

develop the record, "it is not the ALJ's duty to become the claimant's advocate." *Henrie v. U. S. Dep't of Health & Human Servs.*, 13 F.3d 359, 361 (10th Cir. 1993). The claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) (citing 20 C.F.R. § 416.912(a) (stating that "[claimant] must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s)"); and 20 C.F.R. § 416.912(c) (stating "[y]our responsibility. You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say you are disabled")) In addition, "[r]eversal...is appropriate only in the applicant shows prejudice from the ALJ's failure to request additional information." *Newton*, 209 F.3d 448, 458 (5th Cir. 2000) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1985)). "'Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision.'" *Newton*, 209 F.3d at 458 (quoting *Ripley*, F.3d at 557 n.22.)

In the instant case, the Court cannot say that the ALJ failed in his duty to fully develop the record by not contacting the Orthopedic Associates. Plaintiff does not identify what evidence would have been adduced had the ALJ sought clarification of the Orthopedic Associates' note, nor does he describe how such evidence would have affected the outcome of the case. Thus, he has not established prejudice. Moreover, it is not clear that additional information could have been adduced prior to the time the ALJ rendered his decision. (Tr. at 362.) In the note, dated March 10, 2000, the unidentified physician states that he is "currently working [Plaintiff] up for possible lumbar fusion[.]" The accompanying report by Dr. Callewart, dated February 25, 2000, indicates that Plaintiff will undergo a discogram "in consideration of fusion." (Tr. at 363-64.) Both the note and

report are speculative in tone and were authored close to the time of the hearing, which occurred on

April 10, 2000.  The ALJ issued his findings soon after the hearing, on April 27, 2000.  Thus, it does

not appear that extensive additional documentation would have been available to the ALJ at the time

he rendered his decision, or that such documentation would have conclusively indicated a need for

surgery.  Plaintiff has also failed to establish that evidence indicating a need for surgery would have

affected the ALJ's disability determination.  Accordingly, the Court finds that the ALJ did not err

by not contacting Orthopedic Associates.

### 2.    Chiropractor's Opinions

Plaintiff contends that the ALJ failed to adequately consider the opinion of John Tignor, a

chiropractor, stating that Plaintiff could only do sedentary work, and Marsha Miller's opinion that

Plaintiff could not perform any kind of work.  (Pl. Br. at 5, citing Tr. at 318, 374.)  Noting that the

ALJ referred to a test conducted by Dr. Tignor, Plaintiff argues that "if a chiropractor's opinion is

valid in one context, it should be valid in another as well."  (Pl. Br. at 5.)

As Plaintiff concedes, a chiropractor's opinion is not considered a medical source, but rather

as an "other source" under the regulations.  20 C.F.R. § 404.1513.  As such, "the ALJ has the

discretion to determine the appropriate weight to accord the chiropractor's opinion based on all the

evidence before him; under no circumstances can the regulations be read to require the ALJ to give

controlling weight to a chiropractor's opinion."  *Diaz v. Shalala,* 59 F.3d 307, 314 (2d Cir. 1995);

*see also Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991) ("[T]he relevant regulations accord

less weight to chiropractors than to medical doctors.") (citing 20 C.F.R. § 404.1513)).  In the instant

case, then, because Dr. Tignor and Dr. Miller are chiropractors, the ALJ had no duty to give those

opinions controlling weight.  Thus, the ALJ could properly reference a test conducted by Dr. Tignor

without then having to rely on every opinion expressed by him.

In addition, "the ALJ has sole responsibility for determining a claimant's disability status." *Newton*, 209 F.3d at 455 (quoting *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)). "Among the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.'" *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (citing 20 C.F.R. 4041527(e) & (e)(3)). Such determinations are legal conclusions reserved by regulation to the Commissioner. *Frank*, 326 F.3d at 620. Thus, because the ALJ has sole responsibility for determining Plaintiff's disability status, the ALJ did not err in rejecting Dr. Tignor's statement that Plaintiff could do only sedentary work and Dr. Miller's statement that Plaintiff could perform no work. Accordingly, the ALJ's decision to reject the chiropractors' opinions on Plaintiff's disability status does not constitute error.

### 3.   Dr. Buley

Plaintiff contends that the ALJ failed to acknowledge the recommendation of Dr. Buley, a state agency medical consultant, that Plaintiff not engage in repetitive bending and lifting activities. (Pl. Br. at 6.)

Social Security regulations dictate that ALJs "must consider findings of State agency medical and psychological consultants...as opinion evidence. . ." 20 C.F.R. § 404.1527(f)(2)(I). "[T]he failure to consider every opinion or statement of an SAMC in an administrative decision that otherwise discusses the findings of said SAMC may. . .constitute harmless error." *Alejandro v. Barnhart*, 291 F. Supp. 2d. 497, 516-17 (S.D. Tex. 2003) (citing *Mitchell v. Barnhart*, 2003 WL 1565467, at *1 (4th Cir. Mar. 27, 2003) (per curiam); *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985); *Mirza v. Barnhart*, 2003 WL 21058542, at *4 n.3 (N.D. Ill. May 9, 2003)). If substantial evidence supports the ALJ's decision, a failure to reference a particular opinion or statement of an SAMC may be harmless. *Alejandro*, 291 F. Supp. 2d. at 517.

23

In his decision, the ALJ wrote that Dr. Buley:

> noted that the claimant was not taking any medication at all.  Dr. Buley found no neurological deficits (except that the claimant exhibited giveaway weakness during one test), while there was no evidence of muscle atrophy.  Straight leg raising was negative for production of back pain.  X-rays of the lumbosacral spine were negative for any abnormalities.  Dr. Buley opined that the claimant could perform light work.

(Tr. at 22.)  The ALJ's discussion of Dr. Buley's evaluation of Plaintiff demonstrates that the ALJ complied with the Social Security regulations dictating that he consider Dr. Buley's opinion.

To the extent that the ALJ may have erred in not mentioning Dr. Buley's particular recommendation that Plaintiff not engage in repetitive bending and lifting activities, such error is harmless because substantial evidence supports the ALJ's findings.  Dr. Buley recommended against repetitive bending and lifting in his narrative impression, but he did not repeat the recommendation on the RFC assessment form.  He also checked the box labeled "No" in response to the question "[i]s lifting/carrying affected?"  (Tr. at 359.)  In addition, he indicated that Plaintiff could frequently lift up to 25 pounds.  *Id*.  The assessment did not note any limits on bending activities.

Other than the statement in Dr. Buley's report, Plaintiff has not pointed to any evidence in the record supporting limits on repetitive bending or on lifting, as contemplated by the definition of light work.  The Court nevertheless has reviewed the record, and finds that none of Plaintiff's treating physicians or chiropractors indicate that he is limited in bending or lifting, within the definition of light work.  In addition, neither of the non-examining medical consultants who completed Residual Functional Capacity Assessment forms noted limits on bending or on lifting more than 25 pounds frequently.  Plaintiff, moreover, has neither alleged nor demonstrated that had the ALJ included Dr. Buley's recommendation, the outcome may have been affected.  Accordingly, the ALJ's failure to mention Dr. Buley's recommendation on bending and lifting, to the extent that such failure constitutes error, is harmless, and reversal is not appropriate on this ground.

24

### 4.      Plaintiff's Mental Health Care Providers

Plaintiff cites various comments by his mental health care providers and argues that these statements, in addition to his history of mental health treatment, "directly contradict the ALJ's statement that '[t]here is no evidence that the claimant has severe, chronic depression.'"  (Pl. Br. at 8, citing Tr. at 22.)  Plaintiff further contends that the ALJ's finding that Plaintiff experiences "episodic depression" understates his impairments.  (Pl. Br. at 8, citing Tr. at 24.)

The ALJ addressed Plaintiff's allegation of mental impairment by first summarizing Plaintiff's three-night hospitalization for depression in October 1998, and referencing his only other hospitalization for depression in May 1998.  The ALJ then made the following findings:

> The record shows that the claimant has short bursts of depression, which can be very intense for a few days, but then clears up or is controlled with medication.  It appears that the claimant can become "depressed" easily; for instance, not receiving his workers' compensation settlement as quickly as he thought he should.  There is no evidence that the claimant has severe, chronic depression.  However, I will conclude that his residual functional capacity is limited to those jobs which require only simple tasks, and which allow for a less than moderate concentration deficit.

(Tr. at 22.)

None of the comments Plaintiff cites contradict the ALJ's findings; in fact, these comments generally support the ALJ's findings.  Plaintiff first refers Dr. Roche's May 4, 1999 statement that, due to Plaintiff's depression, "[a]t this point I consider [Plaintiff] <u>disabled</u> until we can get him stabilized." (Pl. Br. at 7, citing Tr. at 354) (emphasis in original).  Plaintiff also cites Dr. Roche's statement, from a letter written August 5, 1999, that Plaintiff's "depression/anxiety is once again stable-but he still suffers from severe pain due to the auto accident and I am not sure when he will be medically able to return to work."  (Pl. Br. at 7, citing Tr. at 353.)  However, these statements show that Plaintiff's depression and anxiety had stabilized within four months of an episode of instability.

Plaintiff also complains that the ALJ failed to reference the diagnostic impression of the psychiatric consultative examiner Dr. Meshack, who reported that Plaintiff suffered from decreased memory and concentration, associated with moderate major depressive disorder.  (Pl. Br. at 7, citing Tr. at 258.)  Plaintiff argues that the "reference to decreased memory and concentration is critical, given the language of Social Security Ruling. . .85-15[.]"  (Pl. Br. at 7.)  Pursuant to SSR 85-15, a "substantial loss" of ability "to understand, carry out, and remember simple instructions" would justify a finding of disability.  1985 WL 56857, *4 (1985).  The diagnostic impression Plaintiff refers to mentions only decreased memory and concentration, and does not reference a "substantial loss" of those abilities; thus SSR 85-15 is not applicable.  Moreover, the ALJ accounted for Plaintiff's decreased memory and concentration by limiting his RFC to simple tasks.  Accordingly, Plaintiff has failed to demonstrate that the ALJ erred by failing to Dr. Meshack's diagnostic impression.

Plaintiff also criticizes the ALJ for failing to reference Dr. Meshack's assessment of Plaintiff's GAF of 30.  (Def. Br. at 7, citing Tr. at 258.)  Dr. Meshack's evaluation, however, does not support her assessment of Plaintiff's GAF.  He points out that a GAF of 30 denotes behavior influenced by delusions or hallucinations, or serious impairment in communication or judgment, including incoherence, grossly inappropriate behavior, or suicidal preoccupation, or inability to function in almost all areas, such as by staying in bed all day, and having no job, home, or friends.  (Pl. Br. at 7.)  In the evaluation, Plaintiff denied hallucinations, paranoid or delusional thinking, and suicidal ideation (other than his history of two hospitalizations).  (Tr. at 257.)  His attention and concentration appeared to be intact, and he was "fairly logical and coherent."  *Id.*  Dr. Meshack also wrote that Plaintiff reported rising at the same time every morning, cooking and cleaning for himself, caring for his children every other weekend, and having two friends on whom he could

depend.  (Tr. at 256-57.)  Because Dr. Meshack's GAF rating of Plaintiff is not supported by her assessment of him, the ALJ does not appear to have erred in failing to reference that GAF.

Plaintiff next notes that the ALJ failed to note that Plaintiff was discharged from his second hospitalization with a diagnosis of major depressive disorder and dependent personality traits, and that he had a GAF of 10 on admission and of 55 on discharge.  (Pl. Br. at 7-8, citing Tr. at 153, 159) On discharge, Dr. Roche stated that Plaintiff "was not manic, not suicidal, not homicidal, not psychotic.  His depression was markedly better.  He was able to cope better with his issues."  (Tr. at 153.)  Such evidence supports the ALJ's conclusion that Plaintiff's depression is manageable.

Plaintiff further argues that "[a]nother example of the continuing nature of plaintiff's mental impairments is to be found in records from Kaiser Permanente.  Dating between October 10, 1997 and March 18, 1998, depression is noted in most of the progress notes."  (Pl. Br. at 8, citing Tr. at 139-148.)  Of the records of those seven appointments, all do in fact reference Plaintiff's treatment for depression, often referring to his depression in conjunction with his legal disputes with his former wife.  (Tr. at 140-142, 147.)  The notes also show that Plaintiff reported sleeping and doing better on Prozac.  (Tr. at 140-41.)  These records therefore are consistent with the ALJ's finding that Plaintiff's depression can be controlled with medication.

In sum, most of the evidence to which Plaintiff refers actually supports rather than undermines the ALJ's decision.  Plaintiff has failed to demonstrate that the ALJ understated Plaintiff's depression, or that the ALJ erred in his discussion of Plaintiff's depression.  Moreover, substantial evidence supports the ALJ's finding that Plaintiff suffers from depression that is controlled by medication.  Accordingly, reversal is not appropriate on these grounds.

### C.1.    Plaintiff's Request to Remand for Consideration of Evidence of Post-Decision Surgery

Within the section of his brief addressing the first issue presented, Plaintiff also argues that

his claim should be remanded because he had surgery after the ALJ rendered his decision. (Pl. Br. at 6.) Plaintiff attached to his brief a discharge summary, dated December 4, 2000, from Baylor University Medical Center in which Dr. Callewart states that he performed an L5 to sacrum decompression and fusion using a local bone graft. (Att. to Pl. Br., Exh. 1.)

Courts "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C.A. § 405(g). In light of 42 U.S.C. § 405(g), the Fifth Circuit has stated that to justify remand based on new evidence presented by a claimant, "the evidence must be (1) new, (2) material, and (3) good cause must be shown for the failure to incorporate the evidence into the record in a prior proceeding." *Bradley v. Bowen*, 809 F.2d 1054, 1058 (5th Cir. 1987) (per curiam) (citing *Dorsey v. Heckler*, 702 F.2d 597, 604 (5th Cir. 1983)). A plaintiff will not satisfy the materiality requirement where the new evidence relates to "the subsequent deterioration of the previously non-disabling condition." *Id.* (citing *Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir. 1985) (quoting *Szubak v. Sec'y of Health & Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984)) (internal quotations omitted).

The discharge summary is new, because it was not issued until after the Appeals Council denied Plaintiff's request for review of the ALJ's decision, but Plaintiff has neither addressed nor satisfied the materiality or good cause requirements. Plaintiff did not address whether the surgery occurred because of a deterioration in his condition. In fact, the evidence suggests that the surgery did take place due to a deterioration in his condition. Describing the history of Plaintiff's illness in the discharge summary, Dr. Callewart wrote that Plaintiff's "pain was progressively getting worse; he had failed conservative care." (Att. to Pl. Br., Exh. 1.) Because the discharge summary suggests

28

a deterioration in Plaintiff's condition, and Plaintiff has presented no evidence otherwise, remand

is not appropriate. *See Leggett*, 67 F.3d at 567 (rejecting plaintiff's request for remand where he

offered no evidence that his current disability did not result from the deterioration of a previously

non-disabling condition); *Falco v. Shalala,* 27 F.3d 160, 164 (5th Cir. 1994) (rejecting plaintiff's

request to remand the case for consideration of a doctor's report noting restrictions on sitting and

lifting, finding that "[t]he most that this report reflects is the fact that Falco's condition has

deteriorated."). Accordingly, Plaintiff's request for remand on the basis of new evidence should be

denied.

**D.      Issue 2: ALJ's Conclusions from Evidence**

Plaintiff contends generally that the "ALJ drew inappropriate conclusions from the

evidence." (Pl. Br. at 8.) As examples, Plaintiff cites the ALJ's conclusion regarding Plaintiff's trip

to Holland and his testimony regarding his ability to sit or stand alternately. *Id*. at 8-9. Plaintiff

does not address how these allegedly inappropriate conclusions constitute reversible error.

In the ALJ's decision, he concludes that Plaintiff, after his first hospitalization for

depression, "did well on Paxil medication; so well, in fact, that he returned to Holland for a few

months[.]" (Tr. at 22.) Plaintiff argues that "any number of conclusions could be drawn from

plaintiff's returning to Holland, including the possibility that he was doing so poorly that he needed

to return to Holland for family support." (Def. Br. 8.) First, Plaintiff has offered no evidence

supporting the conclusion that he returned to Holland only because he needed support, and not, in

part, due to improvements in his depression as a result of medication. More importantly, however,

Plaintiff has failed to show how a different conclusion would have impacted the ALJ's decision.

While the ALJ determined that no evidence supported a finding that Plaintiff has severe, chronic

depression, the ALJ nevertheless concluded that Plaintiff is limited to jobs requiring only simple

tasks, allowing for a less than moderate concentration deficit.  (Tr. at 22.)  Thus, Plaintiff has failed

to establish prejudice as a result of the ALJ's conclusion about Plaintiff's trip.

Plaintiff also claims that the ALJ erred in concluding that Plaintiff said he could perform a

job allowing him to sit or stand alternately.  (Pl. Br. at 9.)  The testimony shows that the ALJ did

misstate Plaintiff's testimony.  The ALJ states that "[t]he claimant said that he was unable to sit or

stand for more than 30 minutes each, but said that he did think that he could perform a job which

allowed him to sit or stand alternatively."  (Tr. at 23.)  In fact, Plaintiff did not make such a

statement.  During the testimony, the following exchange took place between the ALJ and Plaintiff,

after the ALJ questioned Plaintiff regarding his daily routine:

> ALJ:   Now, why couldn't you work then?  I don't mean as a truck driver, but
> something easier?
>
> P:   Well, it hurt me for sitting long, it hurt me for standing long.
>
> ALJ:   How long could you sit?
>
> P:   If I sit straight up, like for a half an hour, and then it kind of starts hurting
> more, and the same way, with standing up.
>
> ALJ:   Could you have had a job where you could sit as long as you want, stand as
> long as you want, change positions as often as you wanted?
>
> P:   Okay, repeat that again.
>
> ALJ:   A job where you could sit as long as you want, stand as long as you want, and
> change positions as often as you wanted?
>
> P:   Basically, when I sit, I more lay on my back, a little bit more to rest my back,
> and keep my back rest.

(Tr. at 49.)  Based on this exchange, it is clear that Plaintiff did not state that he thought he could

perform a job which allowed him to sit or stand alternately.  He did not respond affirmatively or

negatively to the ALJ's question about being able to sit and stand at will, but instead Plaintiff

described his preferred sitting position.  Later in the testimony, Plaintiff's attorney asked Plaintiff, "would you be able to do a job, where you can either sit or stand, or walk around, but not lie down?" (Tr. at 50.)  Plaintiff responded, "[n]o, I don't."  *Id*.  Plaintiff thus correctly points out that the ALJ erred in stating that Plaintiff said he could perform a job sitting or standing alternately, when he actually said he could not.

The Fifth Circuit has held that "procedural perfection in administrative proceedings is not required." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).  Remand is not appropriate unless the Plaintiff can show that he was prejudiced by the alleged error. *Carey v. Apfel*, 230 F.3d 131, 143 (5th Cir. 2000).  "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989).

Plaintiff has not demonstrated that the outcome would have been different if the ALJ had correctly recited Plaintiff's statement about his ability to sit and stand alternately.  Thus, Plaintiff has failed to show that he was prejudiced by the ALJ's error. *See Dziuk v. Barnhart*, 67 Fed. Appx. 248, 2003 WL 21145745, at *1 (5th Cir. 2003) (finding reversal not appropriate, even though the ALJ mischaracterized a treating physician's statement by finding that a bone in the plaintiff's back was fused, where the physician had stated that the bone was *not* fused, because the plaintiff had failed to demonstrate prejudice as a result of the error) (citing *Newton* , 209 F.3d at 458).

In addition, a review of the record reveals that substantial evidence supports the ALJ's finding that Plaintiff could sit and stand alternately.  The ALJ wrote in his decision that "Dr. Buley opined that the claimant could perform light work." (Tr. at 22.)  In his report on the consultative exam, Dr. Buley wrote that "[b]ased on [Plaintiff's] history, physical exam, and test results, he seems to be able to sit without much difficulty, but may have problems standing and walking, for

prolonged periods of time." (Tr. at 356.) No evidence in the record mentions restrictions on sitting and standing. Where substantial evidence supports the ALJ's findings, a misstatement or mischaracterization of evidence will not result in a remand. *See, e.g. Hill v. Barnhart*, 2003 WL 21037402, at *8 (W.D. Tenn. May 6, 2003) (finding that although the ALJ incorrectly stated that the plaintiff denied side effects from her medication, substantial evidence on the record supported the ALJ's determination of mild functional limitations and restrictions); *Humphries v. Apfel*, 2000 WL 204234, at *17 n.4 (N.D. Ill. Feb. 11, 2000) ("[t]o the extent that the ALJ's findings...misstate certain testimony (i.e., the finding that [plaintiff] could perform 4,000 assembler jobs and 2,000 cashier jobs, rather than a reduced–but still significant—number of those jobs given the limitation to his left hand, which the ALJ accepted in his RFC findings) that is harmless given the Court's conclusion that the entire record provides substantial evidence to support the ALJ's findings.") (citing *Fisher*, 869 F.2d at 1057); *Scott v. Shalala*, 898 F. Supp. 1238, 1249 (N.D. Ill. 1995) (finding that although the ALJ misstated the medical expert's testimony about plaintiff's lifting capacity with each hand, substantial evidence supported a finding that plaintiff possessed sufficient lifting capacity to perform light work, and that remand was therefore inappropriate on this basis). Accordingly, reversal is not appropriate on this ground.

**E.      Issue 3: Legal Standard for Determining Severity of an Impairment**

Plaintiff contends that the case must be remanded because the ALJ did not apply the correct standard for determining a disability, as set forth in *Stone v. Heckler*, and instead imposed a higher standard. (Pl. Br. at 9.)

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that a literal

application of this regulation would be inconsistent with the Social Security Act because the regulation includes fewer conditions than are indicated by the statute. *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985). Accordingly, in the Fifth Circuit an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Id.* at 1101. To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used." *Id.* at 1106; *accord Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." *Id*. at 1104.

The Fifth Circuit appeared to leave the lower courts no discretion to determine whether such an error was harmless by mandating that "[u]nless the correct standard is used, the claim *must* be remanded to the Secretary for reconsideration." *Stone*, 752 F.2d at 1106 (emphasis added). However, the Fifth Circuit's "subsequent rulings have narrowed the holding to require remand only when the ALJ failed to cite the *Stone* standard and the case was adjudicated at the second step of the sequential evaluation process." *McClatchy v. Barnhart*, 2004 WL 2810100, at *5 (W.D. Tex. Dec. 3, 2004) (citing *Chaparro v. Bowen*, 815 F.2d 1008, 1011 (5th Cir. 1987); *Jones v. Bowen*, 829 F.2d 524, 527 n.1 (5th Cir. 1987); *Reyes v. Sullivan*, 915 F.2d 151, 154 (5th Cir. 1990)). In *Chaparro*, the Fifth Circuit found that the claimant had waived his argument that the ALJ applied an incorrect standard in determining severity. 815 F.2d at 1011. The Fifth Circuit noted, however, that because the case turned on the ALJ's inquiry at the fourth step of the sequential evaluation process, the

claimant's argument was irrelevant to the case's disposition. *Id*. In *Jones*, the Fifth Circuit refused to find error where the district court used a standard for determining severity similar to that rejected in *Stone*, because the ALJ had proceeded through the fourth and fifth steps of the sequential process. 829 F.2d at 527 n.1. Thus, in a case adjudicated at the fourth or fifth step of the sequential evaluation process, "the ALJ's failure to cite the *Stone* standard does not, without more, necessitate remand." *McClatchy*, 2004 WL 2810100, at *5.

In the instant matter, the ALJ wrote that "[t]he second step of the process inquires whether the claimant has a severe impairment, i.e. one which would have more than a slight effect on his ability to engage in those basic work-related activities set forth in 20 C.F.R. 404.1521(b)." (Tr. at 21.) Using this standard, the ALJ found that "[s]ince the evidence establishes that one or more of these impairments would have more than a slight effect on his ability to work, I will conclude that the claimant's impairments are severe." *Id*. The ALJ did not employ the precise standard set forth in *Stone* ("only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work"), or otherwise refer to *Stone*, a similar decision, or 20 C.F.R. § 404.1520(c). However, the ALJ does not appear to have used a standard distinctly different from that set forth in *Stone*. To the extent that the standard set forth by the ALJ was erroneous, however, the ALJ nevertheless found that Plaintiff's impairments were severe. In addition, the ALJ adjudicated Plaintiff's claim at the fifth step of the sequential evaluation process. Plaintiff must therefore establish that any error on the part of the ALJ constitutes prejudicial error, meriting remand. *See Altvater v. Barnhart,* 2005 WL 475149, at *6 (W.D. Tex. Feb. 10, 2005); *McClatchy*, 2004 WL 2810100, at *5. Plaintiff does not argue that he was prejudiced in any way, nor does he appear to have been prejudiced, as the ALJ found that Plaintiff's impairments were severe, and proceeded through steps three, four, and five of the

sequential process.  Accordingly, the Court finds that any error on the ALJ's part in failing to use the correct standard for determining severity does not merit remand.

**F.      Issue 4: Conclusion on Residual Functional Capacity**

Plaintiff asserts, without further elaboration, that the ALJ failed to adequately explain how he arrived at his conclusion regarding Plaintiff's RFC.  (Pl. Br. at 9.)  In his decision, after discussing the first, second, and third steps of the sequential evaluation process, the ALJ states "[n]ext I must determine whether, in spite of his severe impairments, the claimant retains the residual functional capacity to perform either his past relevant work (the inquiry of the fourth step) or some lesser level of work activity (the inquiry of the fifth step)."  (Tr. at 21.)  Eleven paragraphs follow, in which the ALJ discusses Plaintiff's age, education, and ability to speak and read English; Plaintiff's testimony related to his depression, lower back pain, and physical capabilities; evidence from the record related to Plaintiff's treatment for depression and lower back pain; and a recitation of the definition of light work activity.  (Tr. at 21-23.)  Then, the ALJ states "I have concluded that the claimant retains the residual functional capacity for light work" with certain limitations.  (Tr. at 23.)  It is clear that the ALJ's discussion following his statement that he must determine Plaintiff's RFC formed the basis for his determination of Plaintiff's RFC.  Thus, the Court finds that the ALJ did not, as Plaintiff alleges, fail to explain how he arrived at the RFC he determined, and thus did not err.

**G.      Issue 5: Impairments Included in Hypothetical Question**

Plaintiff contends that the ALJ erred by failing to include in the hypothetical question the issues of: (1) Plaintiff's literacy or proficiency in the English language; (2) Plaintiff's testimony about lying down; and (3) Dr. Buley's recommendation that Plaintiff not engage in repeated bending and lifting activities.  (Pl. Br. at 7.)  Plaintiff does not state how he was prejudiced by these alleged

errors.

To establish that work exists for a claimant, the ALJ relies on the medical-vocational guidelines or the testimony of a VE in response to a hypothetical question. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Bowling*, 36 F.3d at 436. A claimant's failure to point out deficiencies in a hypothetical question does not "automatically salvage that hypothetical as a proper basis for a determination of non-disability." *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001). If, in making a disability determination, the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden of proof to show that despite his impairment the claimant could perform available work. *Id.* at 708.

The ALJ posed a hypothetical question to the VE and asked her to:

> [A]ssume an individual, the claimant's age, education, and work experience. Assume the individual could be limited to the exertional level of light work. Could sit, or stand, at his option. Could not climb, balance, crawl, or kneel. Could occasional stoop, crouch, and squat. The individual has a less than moderate concentration deficit. He cannot do repeated pushing and pulling. And no repeated extended reaching, that is with the back. And the individual is limited to generally simple tasks.

(Tr. at 58.) Based on this hypothetical question, the VE opined that Plaintiff could perform work at the light unskilled level, including such jobs as bench assembler, sorter inspector, and small parts packager. (Tr. at 58.) The VE stated that in the national economy, approximately 80,000 to 100,000 positions were available as a bench assembler, 80,000 as a sorter inspector, and 60,000 as a small parts packager. *Id.* Plaintiff's attorney then posed additional questions to the VE concerning the effect of a need to lay down during the day, pain medication, and depression on Plaintiff's ability to work. *Id.* The VE testified that if Plaintiff had to leave his work station during the day to lay

36

down, he would not remain competitively employed. (Tr. at 58.)

In his findings, the ALJ determined that the Plaintiff's impairments are severe. (Tr. at 21.) The ALJ's determination of Plaintiff's RFC incorporated the restrictions imposed by Plaintiff's exertional and nonexertional limitations, including no climbing, balancing, kneeling, or crawling; only occasional squatting, stooping, or crouching; and no repetitive pushing and/or pulling with the upper extremities, or repetitive extended reaching. (Tr. at 23.) The ALJ incorporated the RFC in the hypothetical question posed to the VE. Because the hypothetical question reasonably incorporated all of the limitations recognized by the ALJ, the question was not in error. *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988).

In his assessment of Plaintiff's RFC, the ALJ did not recognize any limitations based on Plaintiff's literacy or proficiency in the English language. The ALJ did not recognize any limitations on Plaintiff's bending, or any limits on Plaintiff's ability to lift within the limitations proscribed by the definition of light work. The ALJ did not give credence to Plaintiff's testimony about his functional limitations, including his statement that he needed to lie down throughout the day, and thus did not recognize any limitations on Plaintiff's ability to sit and stand alternately. In other sections of these findings, conclusions, and recommendations, the Court addresses the ALJ's exercise of his discretion to not recognize these limitations, and has found either that the ALJ did not err, or that any error was harmless. (*See* II, C, 3; II, H; II, K.) Thus, because the ALJ incorporated all the limitations he recognized into the hypothetical posed to the VE, and did not err in declining to include the issues to which Plaintiff points, the Court finds that the hypothetical was not defective.

## H.      Issue 6: Literacy in the English Language

Plaintiff contends that the ALJ did not properly address Plaintiff's literacy in the English

language because the ALJ failed to determine Plaintiff's level of competency in speaking, reading, and writing in English.  (Pl. Br. at 10.)  Plaintiff does not point to any legal error in how the ALJ addressed Plaintiff's literacy, and thus appears to argue that the ALJ's decision with respect to Plaintiff's literacy is not supported by substantial evidence.

The ALJ found that although Plaintiff was educated in the Netherlands, "he is able to communicate and read English."  (Tr. at 21.)  On the Disability Report Plaintiff submitted to the Social Security Administration, he stated that he can speak, read, and write more than his name in English. (Tr. at 101.)  Plaintiff also demonstrated his ability to read and write English by filling out forms for the Social Security Administration.  (*See, e.g.*, Tr. at 111-116.)  At the hearing, Plaintiff testified that he did not learn English in school, but "through TV or reading newspapers, and my ears."  (Tr. at 44.)  He also stated that he can read "about 90 percent" of English.  (Tr. at 56.)  The testimony reflects Plaintiff's ability to communicate in English, despite some errors in syntax and grammar.  Thus, substantial evidence supports the ALJ's finding on Plaintiff's literacy in the English language, and the Court finds no inadequacies in the ALJ's discussion of Plaintiff's literacy.

## I.      Issue 7: Interpreter

Plaintiff also contends that the "ALJ's failure to secure the services of an interpreter to translate at the hearing means that plaintiff may not have been able to fully express himself, may not have fully understood the questions asked of him, and the proceedings at [sic] general, and that therefore the ALJ may not have arrived at a decision based on the benefits of fully informed testimony."  (Pl. Br. at 11.)

Plaintiff provides no authority supporting his contention that the ALJ erred in failing to call an interpreter in this case.  The Court located one case discussing at length a claimant's right to an interpreter.  In *Di Paolo v. Barnhart*, the claimant testified at the hearing that she was from

Venezuela and spoke Spanish, Italian, and a little English.  2002 WL 257676, at *1 (E.D.N.Y. Feb. 8, 2002).  At the beginning of the hearing, the claimant's counsel told the ALJ that the claimant's disability report stated that she "'hardly spoke English,'" thus indicating a need for an interpreter. *Id*. at *5.  The district court found that the claimant's "inability to communicate in English was evident throughout the proceeding." *Id*.  Both the ALJ and the claimant's attorney struggled to phrase questions in a manner that she would understand; at one point in the testimony, the ALJ had the medical expert attempt to communicate with the claimant in Italian. *Id*.  Because the claimant's need for an interpreter "should have been recognized before the hearing" and "was obvious at the outset of the hearing," the district court remanded the case for a hearing with an interpreter to ensure that the claimant receive a full and fair hearing. *Id*. at 9.

The instant situation is clearly distinguishable.  First, Plaintiff did not indicate the need for an interpreter prior to the hearing.  HALLEX, the Social Security Administration's manual on Hearings, Appeals and Litigation Law, directs ALJs to determine whether a claimant needs an interpreter by reviewing several items, including the Request for Hearing form and the Disability Report, as well as any reports of contact with the claimant or other statements indicating the need for an interpreter. *See* http://www.ssa.gov/OP_Home/hallex/I-02/I-2-1-70.html.  On Plaintiff's Request for Hearing form, neither Plaintiff nor his attorney, both of whom signed the form, checked the box indicating a need for an interpreter.  (Tr. at 75.)  In Plaintiff's Disability Report, he indicated that he could speak, read, and write more than his name in English.  (Tr. at 101.)  Thus, Plaintiff and his counsel gave no indication prior to the hearing that an interpreter would be needed.

At the hearing, neither Plaintiff nor his counsel requested an interpreter.  The transcript of the testimony does not indicate that an interpreter would be needed.  At the beginning of the hearing, the ALJ questioned Plaintiff prior to the arrival of his counsel.  The exchange indicates no

deficiencies in Plaintiff's ability to communicate in English:

> ALJ:    All right, Mr. Van Zanten, your file says you're supposedly represented by
> a       lawyer?
>
> A:      Right.
>
> ALJ:    Who is this guy?
>
> A:      Mr. David Line.
>
> ALJ:    Where is he?
>
> A:      He should be here any minute.
>
> ALJ:    Well, no, he should have been here before.
>
> A:      I know.

(Tr. at 39.)  Plaintiff also acknowledged that he could speak English when questioned by the ALJ. (Tr. at 44.)

The only instance of possible misunderstanding to which Plaintiff points is that regarding his response to the ALJ's question about Plaintiff's ability to sit or stand alternately.  (Pl. Br. at 11.) However, Plaintiff's response does not clearly indicate that he could not understand the question, but rather that he wanted to elaborate on a previous answer about the manner in which he sits.  When his counsel asked him an almost identical question, Plaintiff answered simply, "No, I don't."  (Tr. at 50.)  The problem appears not to have been Plaintiff's misunderstanding, then, but the ALJ's, who wrote that Plaintiff had affirmatively stated that he could alternately sit and stand when he had not in fact said that.

Accordingly, the Court finds that the ALJ did not err in declining to call for an interpreter in this case.

**J.     Issue 8: Plaintiff's Education**

Plaintiff contends that the ALJ erred in failing to discuss the issue of Plaintiff's education. (Pl. Br. at 11.)  However, Plaintiff also states that "although the matter of plaintiff's education in Holland was in fact addressed, the specific level of education, except a reference to lower school, was not." *Id.*  A discussion of his level of education, Plaintiff asserts, "would of course be relevant to vocational issues and potentially to the application of a medical-vocational guideline (grid)."

The ALJ stated in his decision that Plaintiff "was educated in his home country of the Netherlands" and does not specify the level of education he attained.  (Tr. at 21.)  At the hearing, however, the ALJ asked Plaintiff how much education he had, and Plaintiff testified that he had completed lower school.  (Tr. at 43.)  Later in the hearing, the ALJ quizzed the VE regarding Plaintiff's level of education.  (Tr. at 57.)  The ALJ corrected the VE when she said that Plaintiff had the equivalent of a high school education.  *Id.*  He told her that Plaintiff had only eight years of schooling in the Netherlands, and had Plaintiff confirm this.[6]  *Id.*

In making his determination that Plaintiff could work, the ALJ did not rely on the medical vocational guidelines, because he had found that Plaintiff's ability to perform light work is somewhat compromised.  (Tr. at 23.)  Instead, the ALJ relied on the VE's testimony, and, after ensuring that she knew how many years of school Plaintiff attended, asked her to assume an individual of his education level.  (Tr. at 58.)  Accordingly, the Court finds that the ALJ did not fail to address the issue of Plaintiff's education.

**K:     Issue 9: Credibility Assessment**

Plaintiff asserts that the "ALJ erred in failing to make a specific finding regarding plaintiff's credibility and in failing to discuss this issue in the body of his decision."  (Pl. Br. at 11.)  However,

---

[6]According to Plaintiff's Disability Report, he had actually attended school for ten years.  (Tr. at 108.)

Plaintiff acknowledges that the ALJ made a finding that Plaintiff's "testimony concerning his functional limitations was not reasonably supported by the objective clinical findings." (Pl. Br. at 11, citing Tr. at 24.) Such a finding reflects the ALJ's determination that Plaintiff's testimony was not credible. Thus, the Court focuses on Plaintiff's assertion that the ALJ failed to discuss the issue in the body of his decision. As a result of this failure, Plaintiff argues, determining which aspects of his testimony formed the basis for the ALJ's decision is not possible, and remand is therefore required. (Pl. Br. at 12.)

The ALJ is required to make affirmative findings regarding a claimant's subjective complaints, because pain constitutes a disabling impairment when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Falco v. Shalala*, 27 F.3d at 163. However, an ALJ is not required to articulate specifically the evidence supporting a credibility finding and to discuss the evidence that was rejected. *Id.* Only when the evidence clearly favors the claimant must the ALJ "articulate reasons for rejecting the claimant's subjective complaints of pain." *Id.* Even then, the ALJ need not "follow formalistic rules in his articulation[.]" *Id.* at 164.

SSR 96-7p establishes a two-pronged test the ALJ must follow when evaluating the credibility of a claimant's complaints of pain. First, the ALJ must determine if there is an underlying medically determinable physical impairment that could reasonably be expected to produce the individual's pain. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). Second, "the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities." *Id.* According to SSR 96-7p, 20 C.F.R. § 404.1529(c) "describes the kinds of evidence. . .that the adjudicator must consider in addition to the objective medical evidence when assessing

the credibility of an individual's statements[.]" *Id.*  Those factors include: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of his pain; (3) factors that precipitate and aggravate the pain; (4) the type, dosage, effectiveness, and side effects of medication taken to relieve the pain; (5) treatment other than medication used for pain relief; (6) measures other than treatment used to relieve pain, such as lying flat; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain.  *Id.*

In the instant matter, the ALJ did not specifically articulate the factors he relied on in determining that Plaintiff's testimony regarding his functional limitations was not supported by the objective medical evidence.  However, the ALJ did discuss in his findings many of the factors listed in 20 C.F.R § 404.1529(c) and SSR 96-7p, including the type of Plaintiff's pain medications, the location, duration, frequency, and intensity of his pain, the kinds of treatment he has had, and the observations of treating and reviewing physicians.  (Tr. at 22-23.)  In addition, although not specifically discussed in his findings, the ALJ questioned Plaintiff about his daily activities at the hearing.  (Tr. at 47-48.)  Plaintiff stated that he lived alone, did all the cleaning, went to the store, went to church, and cared for his children when they visited him every other weekend.  (Tr. at 47-49.)  Notably, however, Plaintiff described no limitations on his ability to care for himself, his apartment, or his children.  While the ALJ did not follow formalistic rules in articulating his credibility assessment of Plaintiff, the ALJ did address a number of the factors listed at 20 C.F.R § 404.1529(c) and incorporated into SSR 96-7p.  The Court finds, moreover, that the record provides substantial evidence to support the ALJ's credibility determination of Plaintiff.

Plaintiff argues that the ALJ "failed to adequately inquire into and discuss" Plaintiff's testimony regarding a measure used by him to relieve pain.  (Pl. Br. at 12.)  Plaintiff had testified

43

that he spent most of his time at home lying down.  (Tr. at 48.)  However, the ALJ is not required to articulate each piece of evidence rejected where, as here, the evidence does not clearly favor the Plaintiff.  *Falco*, 27 F.3d at 163.  Thus, it is of no importance that the ALJ did not "follow formalistic rules in [his] articulation."  *Falco*, 27 F.3d at 164.

Even assuming, *arguendo*, that the ALJ erred by failing to provide a more detailed discussion of  his assessment of Plaintiff's credibility, or any of the factors relevant to such an assessment, Plaintiff has neither argued nor demonstrated that more extensive discussion would have affected the outcome of the disability determination.  Accordingly, reversal and remand is not appropriate. *See  Frank*, 326 F.3d at 622 (declining to reach the merits of plaintiff's arguments that the ALJ relied on impermissible factors in assessing credibility where the objective medical evidence showed that the ALJ would have reached the same conclusion even if he had not relied on the allegedly impermissible factors).

**L.      Issue 10: Opportunity to Object to Evidence in File**

Plaintiff contends that the ALJ "erred in failing to offer plaintiff's former counsel an opportunity to object to the evidence in the file."  (Pl. Br. at 12.)  In the three sentences of his briefing on this issue, Plaintiff does not argue that the ALJ prevented Plaintiff's former counsel was prevented from objecting to evidence in the file.  Thus, it appears that Plaintiff is asserting that the ALJ has an affirmative duty to invite a claimant's counsel to object to evidence.  However, Plaintiff cites no authority for this proposition.  Even assuming, *arguendo*, that the ALJ has such a duty, Plaintiff has not asserted that his counsel would have objected to any evidence in the file if asked whether he wished to do so.  Plaintiff therefore has failed to establish prejudice as a result of any alleged error on the part of the ALJ to specifically ask Plaintiff's counsel if he objected to evidence

in the file.[7]  Accordingly, reversal is not appropriate on this ground.  *See Mays*, 837 F.2d at 1364; *Fisher*, 869 F.2d at 1057.

## M.      Issue 11: Applicability of Listings

Plaintiff asserts that the "ALJ erred in failing to adequately consider the applicability of the listings in this case."  (Pl. Br. at 12.)  More specifically, Plaintiff argues that the ALJ should have considered the applicability of listings of § 12.04, relating to affective disorders, and § 1.04, relating to disorders of the spine.[8]  (Pl. Br. at 12.)  In this three-sentence section of his brief, Plaintiff does not further elaborate on this contention.  However, in Plaintiff's briefing on the first issue presented, he asserts that the evidence he alleges the ALJ rejected or failed to acknowledge supports a finding that Plaintiff meets the listings.  (Pl. Br. at 7-8.)

The listings to which Plaintiff refers are set out at 20 C.F.R., Part 404, Subpart P, Appendix 1 ("Listings"), and are considered at the third step of the sequential evaluation process.  The Listings "are descriptions of various physical and mental illnesses. . .most of which are categorized by the body system they affect."  *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990).  "Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results."  *Id*. at 530.  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria."  *Id*. (emphasis in original).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id*. (citing SSR 83-19).  The criteria in the

---

[7]Moreover, at the beginning of the hearing, Plaintiff's counsel requested, without prompting from the ALJ, that additional documents be admitted into evidence.  (Tr. at 42.)  Because Plaintiff's counsel was able to offer evidence without prompting, it appears that he should also have been able to object to evidence without prompting, had he wished to do so.

[8]Plaintiff also states that the ALJ should have considered Listing 1.05(c).  (Pl. Br. at 12.)  Current Listing 1.05(c) relates to amputation of one hand and one lower extremity.  Plaintiff has not provided any evidence of amputation, and in another part of the brief he refers to the old listing § 1.05(c).  (Pl. Br. at 7.)  Thus the Court does not consider current Listing 1.05(c), which is clearly not applicable.

Listings are designed to be demanding and stringent.  *Falco*, 27 F.3d at 162.  This is because the Listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary."  *Sullivan*, 493 U.S. at 532.

The claimant bears the burden of proving that his impairments meet or equal impairments found within the Listings.  *Henson v. Barnhart*, __F. Supp. 2d. __, 2005 WL 1391161, at *7 (citing *McCuller v. Barnhart*, 72 Fed. Appx. 155, 158 (5th Cir. 2003); *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990); 20 C.F.R. § 404.1526(a)).  If a claimant fails to meet this burden, the court must find that substantial evidence supports the ALJ's finding.  *Henson*, 2005 WL 1391161, at *7 (citing *Selders*, 914 F.2d at 620.

First, the Court addresses Plaintiff's contention that the ALJ did not adequately consider the Listings in this case.  In his decision, the ALJ determined that Plaintiff has no impairment that meets the criteria of *any* impairment in the Listings.  (Tr. at 21) (emphasis added).  This statement implies that the ALJ considered the particular Listings to which Plaintiff points, even if the ALJ did not specifically reference them.  In addition, in reaching his determination, the ALJ stated that he reviewed all the evidence, including the records submitted by Plaintiff's treating and examining physicians, and noted that none of those physicians mentioned findings equivalent to the criteria of any listed impairment.  (Tr. at 21.)  The ALJ also wrote that he considered the opinions of medical consultants who evaluated the issue at the initial and reconsideration levels of the administrative review process, and determined that Plaintiff's impairments did not meet the criteria in the Listings.  *Id.*  Given the ALJ's discussion of his analysis at step three of the sequential process, the Court finds that the ALJ did not fail to adequately consider the applicability of the Listings in this case.

Next, the Court considers Plaintiff's assertion that the evidence supports a finding that he

meets the requirements of Listings 1.04 and 12.04.  Listing 1.04 covers disorders of the spine, and

includes spinal stenosis and degenerative disc disease.  To meet the listing, a claimant must show:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution
> of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle
> weakness or muscle weakness) accompanied by sensory or reflex loss and, if there
> is involvement of the lower back, positive straight-leg raising test (sitting and
> supine); or . . ..
>
> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings
> on appropriate medically acceptable imaging, manifested by chronic nonradicular
> pain and weakness, and resulting in inability to ambulate effectively.[9]

In his briefing on the first issue, Plaintiff points to several comments made by physicians and other

health care providers he asserts the ALJ rejected or failed to acknowledge, but which support a

finding that he meets the Listings.  (Pl. Br. at 7.)  None of those comments, discussed in Section II,

C above, address the symptoms described within the Listings.  Moreover, the record contains

evidence supporting a finding that Plaintiff does not meet Listing 1.04.  For example, Dr. Buley's

physical examination revealed no muscle atrophy and essentially negative straight leg raises, two

of the symptoms under 1.04(A).  (Tr. at 356.)  Thus, Plaintiff cannot establish that he meets the

criteria for 1.04(A).  Dr. Buley also observed that Plaintiff "ambulates with a normal gait pattern[.]"

(Tr. at 356.)  The inability to ambulate effectively is one criteria a claimant must establish under

Listing 1.04(C).  Because Plaintiff can ambulate effectively, he cannot establish that he meets the

criteria for Listing 1.04(C).  Thus, Plaintiff has failed to meet his burden to establish that he meets

the criteria of Listing 1.04.

In the first issue he presented, Plaintiff also pointed to evidence of his depression he asserted

the ALJ rejected or failed to acknowledge.  (Pl. Br. at 8.)  This evidence, he argues, suggests that

---

[9] 1.04(B) addresses spinal arachnoiditis.  Plaintiff has not alleged, nor does a review of the record indicate,
that Plaintiff suffers from this condition.

he meets the requirements of Listing 12.04, which addresses affective disorders.  None of this evidence, however, supports a finding that Plaintiff meets all the criteria of Listing 12.04.  To satisfy the required level of severity for affective disorders, a claimant must satisfy the requirements of 12.04(C), or of 12.04(A) and two of the criteria at Listing 12.04(B), which includes (1) marked restrictions in activities of daily living, (2) marked difficulties maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace, OR (4) repeated episodes of decompensation, each of extended duration.  Plaintiff does not explain how the evidence to which he pointed in his briefing on the first issue presented satisfies these criteria, nor does the record support a finding that he satisfies these criteria.  For example, the Social Security Administration defines "repeated episodes of decompensation" as three or more episodes.  (Tr. at 298.)  The record, however, indicates only two episodes of decompensation.  (Tr. at 236.)  For this reason, Dr. Zimmerman, a medical consultant, determined that Plaintiff had not experienced repeated episodes of decompensation.  (Tr. at 298.)  Plaintiff has also failed to point to evidence that he meets the criteria at Listing 12.04(C), which includes, for example, one or more years of inability to function outside a highly supportive living environment.  Thus, Plaintiff has also failed to meet his burden to show he meets the criteria for Listing 12.04.

In sum, the Court finds that the ALJ gave adequate consideration to the applicability of the Listings in this case.  In addition, Plaintiff has failed to satisfy his burden to demonstrate that his impairments meet the criteria of Listings 1.04 or 12.04.  Accordingly, reversal on these grounds is not appropriate.

## N.      Issue 12: Medications

Plaintiff argues that "the ALJ failed to adequately, if indeed at all, inquire into any side

effects of the medications, or to how the pain medications give, or fail to give, relief." (Pl. Br. at 12.) Plaintiff refers to 20 C.F.R. § 404.1529(c)(3)(I) to (vii). Only subsection (iv) of that regulation relates to medication, and provides that "[f]actors relevant to your symptoms, such as pain, which we will consider include: (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms[.]"

Plaintiff states that he "can find only a brief reference to Lortab in the ALJ's decision[.]" (Pl. Br. at 12.) At the hearing, the ALJ asked what Plaintiff did to relieve his pain. (Tr. at 46.) When Plaintiff replied that he took pain pills, the ALJ noted that Plaintiff had reported that he took no pain pills to Dr. Buley. (Tr. at 47.) Plaintiff clarified that he took pain medication, but not all the time, and only when he felt pain. *Id*. Plaintiff also stated that his chiropractor, who did not work for a doctor, prescribed him brown pills for pain, but Plaintiff did not know the name of the pills. (Tr. at 46.) Plaintiff's attorney questioned him about other medication he had been prescribed for depression, but which he was not taking because he no longer had insurance. (Tr. at 53-54.) In his decision, the ALJ noted that Plaintiff took Lortab to control the pain in his lower back. (Tr. at 23.) The ALJ also wrote that Plaintiff's depression appeared was controlled with medication. (Tr. at 22.) Thus, as Plaintiff alleges, the ALJ did not discuss in his opinion the side effects from Plaintiff's medication for depression and lower back pain, or inquire into the effectiveness of the pain medication. However, Plaintiff does not state how such an inquiry would have affected the outcome of the ALJ's decision. Plaintiff does not assert, for example, that the medications cause side effects, or that they are ineffective. Plaintiff therefore has failed to demonstrate prejudice as a result of the ALJ's failure to explore side effects or efficacy of the medication. Because the Court cannot say that a discussion of the side effects and efficacy could have changed the outcome of the ALJ's

decision, reversal is inappropriate.  *Zeno v. Barnhart*, 2005 WL 588223, at *13 (E.D. Tex. Feb. 4, 2005) (declining to reverse due to ALJ's failure to discuss dosages or effectiveness of claimant's medications, due to her failure to demonstrate prejudice as a result of the alleged error).

**N.      Issue 13: Measures Used to Relieve Pain**

Plaintiff contends that "the ALJ failed to adequately inquire into and consider measures used by plaintiff to relieve his pain."  (Pl. Br. at 12.)  Plaintiff's points to his testimony that he lies down while at home and that when sitting, he leans back.  The Court has addressed this contention in Section II, K, above, as it relates to Plaintiff's arguments with respect to the requirements of 20 C.F.R. § 404.1529.  Assuming, *arguendo*, that the ALJ failed to fulfill his duty to develop the record in this respect, Plaintiff has failed to show that he was prejudiced.  He does not explain how sufficient consideration of these measures would have changed the outcome of his case.  Accordingly, reversal of the ALJ's decision is not appropriate on this ground.  *See Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (per curiam) ("To establish prejudice, a claimant must show that he 'could and would have adduced evidence that might have altered the result.'") (quoting *Kane v. Heckler*, 731 F.2d 1216, 1226 (5th Cir. 1984)).

**O.      Issue 14: Consideration of Plaintiff's Mental and Emotional Impairments**

Plaintiff argues that the ALJ did not sufficiently emphasize Plaintiff's mental and emotional impairments and understated the severity of Plaintiff's depression.  (Pl. Br. at 13.)  This argument relates to Plaintiff's contention that the ALJ failed to consider the evidence of Plaintiff's depression properly.  As discussed in Section II, C, 4, this contention is without merit.

Plaintiff also contends that the ALJ's allegedly inadequate discussion of Plaintiff's depression "raise[s] the issue of the interplay of his various impairments, and whether the ALJ has

adequately, if at all, examined the effect of his various impairments in combination." (Pl. Br. at 13.) Plaintiff raises a similar contention in the sixteenth issue presented, and as addressed below in Section II, Q, the Court concludes that the ALJ did not fail to examine Plaintiff's impairments in combination.

**P.      Issue 15: Consideration of Allegations of Pain or Compliance with Social Security Rulings**

Plaintiff contends that "the ALJ failed to adequately discuss pain in his decision, as required by SSR 96-3p...and SSR 96-7p." (Pl. Br. at 13.) Plaintiff also contends that the "ALJ should have considered the impact that work activity would have (had) on Plaintiff and discussed 'the ability to perform sustained work activities in an ordinary work setting, on a regular and continuing basis' for forty hours each week, in accordance with SSR 96-8p." (Pl. Br. at 13.)

SSR 96-3p addresses how an ALJ should evaluate allegations of pain in determining whether an impairment is "severe" at step two of the sequential evaluation process. *See* SSR 96-3P, 1996 WL 374181, at *1 (Jul. 2, 1996). The scope of SSR 96-3p is limited to the severity analysis at step two. Thus, if an ALJ makes a finding of severity at step two and proceeds to the next step of the sequential evaluation process, non-compliance with the requirements of SSR 96-3p will not affect the outcome. *See Harrison v. Massanari*, 2001 WL 637364, at *10 (E.D. La. June 7, 2001) (rejecting claims of error in the ALJ's severity analysis pursuant to 96-3p, as the ALJ proceeded to the next step in the sequential process analysis; thus, any alleged errors at step 2 were immaterial to the outcome). In the instant matter, the ALJ determined at step 2 that the Plaintiff's impairments–including low back pain secondary to degenerative disc disease and depression–were severe. Thus, the ALJ's alleged failure to comply with SSR 96-3p constitutes harmless error, and

51

does not justify reversal.

Plaintiff further asserts that "'[t]here appears to be little discussion of '[t]he duration, frequency, and intensity' of pain, in contravention of 20 C.F.R. Section 404.1529(c)(iii)(2) of the Regulations as well as SSR 96-7p." (Pl. Br. at 13.)  While the regulations do not contain the specific provision to which Plaintiff refers, 20 C.F.R. § 404.1529(c)(4)(ii) provides that Administration will consider "location, duration, frequency, and intensity of [the claimant's] pain..."  In his decision, the ALJ wrote that "[t]he claimant testified that his pain is located in his low back, and that it radiates into his legs.  He said that his pain is constant. . ." (Tr. at 23.)  The ALJ therefore addressed the location and frequency of Plaintiff's pain.  The ALJ also noted that Plaintiff has been treated for low back pain since his motor vehicle accident on August 9, 1998, thus addressing the duration of Plaintiff's pain. (Tr. at 21.)  Finally, with respect to intensity, the ALJ notes that Plaintiff described his lower back pain as severe. (Tr. at 22, 24.)  Notably, the regulation does not mandate a particular level of discussion of the duration, frequency, or intensity of a claimant's pain.  Here, the ALJ did discuss the location, duration, frequency, and intensity of Plaintiff's pain, as required by 20 C.F.R § 404.1529(c)(4)(ii).  Accordingly, Plaintiff's assertion that the ALJ failed to adequately discuss his pain, in contravention of the relevant regulation and SSR 96-7p, is without merit.[10]

The Court next addresses Plaintiff's claim with respect to SSR 96-8p.  SSR 96-8p guides the assessment of residual functional capacity.  1996 WL 374184, at *1 (July 2, 1996).  Plaintiff appears

---

[10]In this section Plaintiff also quotes Supplementary Information from the Federal Registry.  56 Fed. Reg. 57928.  The material quoted summarizes the Administration's two step process for evaluating symptoms of pain. Plaintiff then argues that the "ALJ failed to apply the proper test, which is essentially repeated in SSR 96-7p."  (Tr. at 14.)  The two-step process for evaluating symptoms of pain in SSR 96-7p are based on 20 C.F.R. § 404.1529. This issue is addressed in these findings above, in Section II, K, in which the Court finds that, while the ALJ did not follow formalistic rules in articulating his credibility assessment of Plaintiff, the ALJ did address a number of the factors in SSR 96-7p.  Furthermore, the Court found that even assuming that the ALJ did err in his discussion, Plaintiff failed to establish error, and reversal thus was not appropriate.

to allege that the ALJ failed to include the following elements in his narrative discussion of Plaintiff's RFC, as required by SSR 96-8p:

> In all cases in which symptoms, such as pain, are alleged, the RFC assessment must:
>
> * Contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;
>
> * Include a resolution of any inconsistencies in the evidence as a whole; and
>
> * Set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.

*Id*. at *7; Pl. Br. at 13-14.)  Plaintiff does not state which of the above elements he believes the ALJ neglected to address.

A review of the ALJ's decision reveals that the ALJ adequately addressed the first and second elements above.  The ALJ discussed Dr. Buley's findings and the results of a lumbar myelogram.  (Tr. at 22-23; 322.)  The ALJ also resolved the inconsistency between the Orthopedic Associates' note and Plaintiff's testimony indicating the possibility of surgery, and the evidence that surgery was unwarranted–an opinion expressed by Plaintiff's own treating physician, Dr. Williams. (Tr. at 22, 365.)  Then, the ALJ recounted Plaintiff's testimony that "his pain is located in his low back...and radiates into his legs."  (Tr. at 23.)

With respect to the third element, the ALJ set forth a logical explanation of the effects of Plaintiff's pain on his ability to work in writing that Plaintiff said he could perform a job allowing him to alternately sit or stand.  *Id*.  While this finding was based on a misstatement of Plaintiff's testimony, as discussed above, that finding was supported by substantial evidence.  Plaintiff has not alleged, nor does it appear to the Court, that the outcome would be different had the ALJ based his explanation of the effects of the symptoms on the evidence in the record, rather than a misstatement

of Plaintiff's testimony.  Reversal is not appropriate due to this error where, as here, the narrative discussion required by SSR 96-8p is otherwise adequate, and Plaintiff has failed to establish that his substantial rights were affected by that error.  *Mays*, 837 F.2d at 1364 (holding that "[p]rocedural perfection in administrative proceedings is not required[]" where the substantial rights of a party have not been affected).

## Q.   Issue 16: Plaintiff's Impairments in Combination

Plaintiff contends that the "ALJ's decision fails to address the impact of all of plaintiff's various impairments in combination, as required by 20 C.F.R., Section 404.1523, except in noting that he has no impairment or combination of impairments which meets or equals the severity of any listing."  (Pl. Br. at 14, citing Tr. at 22, 24.)  As an example, Plaintiff states that "while the ALJ briefly notes plaintiff's depression, no effort to look at it in combination with plaintiff's physical/exertional impairments appears to have been made.[11]  (Pl. Br. at 15, citing Tr. at 23, 25.)

Plaintiff's argument overlooks the ALJ's relevant findings and conclusions.  To determine whether a claimant's physical or medical impairments are of a sufficient medical severity that those impairments could form the basis for a finding of disability, 20 C.F.R. § 404.1523 requires that the ALJ "consider the combined effect of all of [the claimant's] impairments."   Here, the ALJ determined that Plaintiff's impairments of depression and low back pain secondary to degenerative disc disease were severe.  (Tr. at 21.)  The ALJ also stated that he had "reviewed all of the evidence and concluded that the claimant's impairments, both singly and in combination, do no meet or equal

---

[11]In this section of his brief, Plaintiff also makes the argues that "to the extent that the ALJ has criticized the credibility of plaintiff, his non-exertional/mental impairments should have been considered in determining plaintiff's credibility."  (Pl. Br. at 15.)  Plaintiff elaborates no further on this point, nor cite any authority for such a requirement.  Furthermore, he has not alleged that the outcome of the case would have been different had the ALJ considered of Plaintiff's non-exertional and mental impairments.  Accordingly, Plaintiff has failed to demonstrate that the ALJ committed any error in this way; to the extent that any error was committed, however, that error was harmless, and reversal is not appropriate on this ground.

the severity of any listing." (Tr. at 21.) After discussing evidence related to Plaintiff's depression, the ALJ concluded that Plaintiff's RFC "is limited to those jobs which require only simple tasks, and which allow for a less than moderate concentration deficit." (Tr. at 22.) The ALJ's RFC assessment also accounted for all the physical limitations recognized by the ALJ. (Tr. at 23.) The hypothetical posed to the vocational expert incorporated this RFC, setting forth both Plaintiff's recognized physical limitations as well as limitations associated with his depression, including the restriction to simple tasks and the less than moderate concentration deficit. (Tr. at 58.) The Court therefore concludes that the ALJ did not fail to address Plaintiff's impairments in combination, as required by 20 C.F.R. § 404.1523. *See, e.g., Pachilis v. Barnhart*, 268 F. Supp. 473, 477 (E.D. Pa. 2003) (finding that the ALJ adequately addressed the claimant's impairments in combination where the ALJ's hypothetical questioning of the vocational expert accounted for both the claimant's mental and physical limitations).

**R.      Issue 17: Requirements of 20 C.F.R. § 404.1529 and SSR 96-7**

In the seventeenth issue presented, Plaintiff asserts that [t]he ALJ's failure to even allude to the requirements of 20 C.F.R. Section 404.1529 is insufficient to satisfy the requirements of SSR 96-7p, particularly in the absence of a sufficient discussion of the evidence." (Pl. Br. at 15.) Plaintiff contends further that "[o]f course, mere recitation of legal requirements should not be sufficient, [sic] real consideration being evidenced by a detailed discussion of the evidence as it relates to each factor." *Id.* Above, in Sections II K, N, O, and P, the Court has addressed and rejected Plaintiff's claims with respect to the ALJ's decision and the requirements of SSR 96-7p and 20 C.F.R. § 404.1529(c). In this section of his brief, Plaintiff does not raise any new issues. Accordingly, reversal is not appropriate on this ground.

**S.      Issue 18: Full and Fair Development of the Record**

In his eighteenth issue presented, Plaintiff contends that the ALJ failed to fully and fairly

develop the facts, as required by *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).  (Pl. Br. at 15.)

In *Ripley*, the Fifth Circuit stated that "[t]he ALJ has a duty to develop the facts fully and fairly

relating to an applicant's claim for disability benefits."  67 F.3d at 557 (citing *Pierre*, 884 F.2d 799,

802 (5th Cir. 1989); *Kane*, 731 F.2d at 1219).  Failure to develop an adequate record is not per se

grounds for reversal.  *Kane*, 731 F.2d at 1220.  Plaintiff must show that he "'could and would have

adduced evidence that might have altered the result.'"  *Brock*, 84 F.3d at 728 (quoting *Kane*, 731

F.2d. at 1226).

Plaintiff's brief includes only the following statement in support of his contention that the

ALJ failed to fully develop the record: "[t]he plaintiff was clearly prejudiced by the ALJ's failure

to develop the record, as is evidenced by the inadequate discussion of matters related to his non-

exertional/mental impairments, by way of example, as well as pain and medication." (Pl. Br. at 15.)

This single sentence does not suffice to meet the required showing of prejudice.  Plaintiff does not

specify what additional evidence a full development of the record would have yielded, nor has he

shown that such evidence could or would have led to a different decision.  Because Plaintiff has

failed to show that he was prejudiced, the ALJ's decision should not be reversed on this ground.

**T.      Issue 19: Consultative Exam**

Plaintiff contends that the ALJ did not properly develop the medical record in this case

because he failed to order a consultative examination to determine whether Plaintiff would require

lumbar fusion.  (Pl. Br. at 15.)

A consultative examination may be necessary to develop a full and fair record. *Wren*, 925

F.2d at 128.   However, the decision to order a consultative examination is within the ALJ's discretion. *Id.*   A consultative examination is only required when the record demonstrates it is necessary for the ALJ to make a determination. *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977).   Reversal is appropriate only if Plaintiff show that he "could and would have adduced evidence that might have altered the result." *Carey*, 230 F.3d at 142.

At the time the ALJ rendered his decision, none of Plaintiff's own treating physicians had determined that surgery was required, and in fact, one had determined that fusion was not appropriate. Plaintiff underwent a consultative orthopedic examination just three months before the hearing, and the examiner did not indicate that surgery was required.  (Tr. at 355-57.)  Given the amount of medical evidence available to the ALJ at the time he made his decision and the fact that no doctor had recommended surgery up to that point, it does not appear likely that an additional consultative exam was necessary for the ALJ to render a decision.  Thus, the Court cannot say that the ALJ failed to fully develop the medical record because he did not order a second consultative exam.

## U.      Issue 20: Medical Expert

Plaintiff contends that "[t]he ALJ erred in not seeking the assistance of a medical expert in this case."  (Pl. Br. at 16.)  Specifically, Plaintiff points to the ALJ's determination that "'[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairments.'" *Id.* (citing Tr. at 21.)  Plaintiff asserts that such a determination is "not within the purview of the ALJ." (Pl. Br. at 16.)  Plaintiff cites no authority in support of the contention that an ALJ cannot make a determination with respect to the listings without the assistance of a medical expert.

An  ALJ is not required to obtain the testimony of an ME.  20 C.F.R. § 404.1527(f)(2)(iii)

("[ALJs] *may* also ask for and consider opinions from medical experts.") (emphasis added); *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989).  An ALJ thus need not seek the assistance of a medical expert to determine whether a claimant's impairments equal the requirements of an impairment in the Listings.  *See Kruchek v. Barnhart*, 125 Fed. Appx. 825, 827 (9th Cir. 2005) (finding that, pursuant to  20 C.F.R. 404.1527(f)(2(iii), 416.945, and 416.946, "the use of an ME for the step-three medical equivalency determination is permissive, not mandatory"); *Lafitte v. Apfel*, 81 F. Supp. 2d. 669, 673-674 (W.D. La. 1999) (finding no error based on ALJ's determination, without the assistance of a medical expert, that the plaintiff's impairments did not meet the requirements of the Listings); *Shelton v. Sullivan*, 1994 WL 848758, at *10 (W.D. La. Nov. 10, 1994) ("the ALJ was within his discretion in this case not to call upon a medical expert to assist him in making a decision [as to whether the plaintiff's impairments met the Listings].")

Here, the ALJ based his findings on the entire record, including the medical records submitted by Plaintiff's treating and examining physicians, as well as the opinions of medical consultants, pursuant to 20 C.F.R. § 404.1527.  (Tr. at 21.)  The available medical evidence was adequate and supported the ALJ's decision.  Accordingly, the ALJ did not err in making a determination with respect to the Listings without the assistance of a medical expert.  *See, e.g. Hollis v. Comm'r of Soc. Sec.*, 116 Fed. Appx. 396, 398 (3rd Cir. 2004) (finding no error where the ALJ made a determination based on the Listings without seeking a medical expert, because the decision to consult a medical expert is discretionary, and not necessary where available medical evidence was adequate and supported the ALJ's decision).

## III.   RECOMMENDATION

Based on the foregoing reasons, this Court recommends that Plaintiff's *Motion for Summary Judgment* be **DENIED**, and that Defendant's *Motion for Summary Judgment* be **GRANTED.**

**SO RECOMMENDED**, on this the 25th day of July, 2005.


*Irma Carrillo Ramirez*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy.  A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory or general objections.  A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992).  Additionally, any  failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc*).*


*Irma Carrillo Ramirez*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE